## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH, NORTHERN DIVISION

| | |
|---|---|
| ALPHONSO RENDON,<br><br>         Plaintiff,<br><br>v.<br><br>CAROLYN W. COLVIN, *in her capacity as Acting Commissioner of the Social Security Administration*,<br><br>         Defendant. | **MEMORANDUM DECISION AND ORDER**<br><br><br>Case No. 1:12-cv-122-EJF<br><br>Magistrate Judge Evelyn J. Furse |

Plaintiff Alphonso Rendon filed this action asking this Court[1] to reverse or remand the final agency decision denying him Disability Insurance Benefits ("DIB") and Social Security Income ("SSI") under Titles II and XVI of the Social Security Act, *see* 42 U.S.C. §§ 1381–1383f (2010). The Administrative Law Judge ("ALJ") determined that Mr. Rendon did not qualify as disabled within the meaning of the Social Security Act. (Admin. R. Doc. 15, certified copy tr. of R. of admin. proceedings: Alphonso H. Rendon (hereinafter "Tr. __").) Based on the Court's careful consideration of the record, the parties' memoranda, and relevant legal authorities, the Court AFFIRMS the Commissioner's decision.[2]

## PROCEDURAL HISTORY

In August 2008, Mr. Rendon filed for DIB and SSI alleging an onset date of disability of January 1, 1998, which he later modified to August 7, 2008. (Tr. 14.) The Regional

---

[1] On April 12, 2013, the parties consented to proceed before the undersigned Magistrate Judge pursuant to 28 U.S.C. § 636(c) and Federal Rule of Civil Procedure 73. (ECF No. 16.)

[2] Pursuant to Civil Rule 7-1(f) of the Rules of Practice for the United States District Court for the District of Utah, the Court concludes it does not need oral argument and will determine the appeal on the basis of the written memoranda.

Commissioner denied Mr. Rendon's claims on December 4, 2008, and upon reconsideration on April 10, 2009. (*Id.*) At Mr. Rendon's request, a hearing before an ALJ took place on May 26, 2010, and continued on September 22, 2010. (*Id.*) On October 29, 2010, the ALJ issued a decision (the "Decision") denying Mr. Rendon's claims. (Tr. 11–40.) On November 19, 2010, Mr. Rendon requested the Appeals Council review the ALJ's Decision. (Tr. 227–34.) The Appeals Council denied Mr. Rendon's request on April 26, 2012, (Tr. 1–6), making the ALJ's Decision the Commissioner's final decision for purposes of judicial review under 42 U.S.C. section 405(g). *See* 20 C.F.R. § 404.981.

## FACTUAL BACKGROUND

Because the ALJ's decision and the parties' briefs provide well-detailed facts, the Court provides only a brief overview of the relevant facts.

### Gout

At the time of the hearings, Mr. Rendon was thirty-two years old. (*See* tr. 235.) Mr. Rendon asserts disability on the bases of gout and mental health impairment. (Pl.'s Opening Br. 14–20.) The first mention of gout in Mr. Rendon's medical records appears in April 2007, when he sought treatment for hemorrhoid pain at the Health Clinics of Utah. (Tr. 445.) In July 2007, while in prison, Mr. Rendon asserted his gout pain made walking difficult, and he took gout medication and steroids, which helped somewhat.[3] (Tr. 593–94, 599, 602–03, 605–06.) In August 2008, Mr. Rendon sought treatment for his gout from Michelle Hicks, F.N.P. (Tr. 438–39.) Ms. Hicks noted Mr. Rendon refused to take a steroid. (Tr. 439.) One month later, Ms. Hicks noted Mr. Rendon had not regularly taken his medication and appeared "quite ambivalent." (Tr. 456.)

---

[3] Mr. Rendon served time in prison periodically between 2003 and 2007. (Tr. 62, 416, 556–636.)

In November 2008, Dr. Jeremy Biggs examined Mr. Rendon and reported "he had no evidence of active gout." (Tr. 448–51.) The next month, in December 2008, Rhonda Lee, P.A.C., treated Mr. Rendon for gout at the Health Clinics of Utah. (Tr. 455.) Mr. Rendon reported he had not taken one of his gout medications because he did not feel a benefit from it. (*Id.*) He did, however, report that his medications provide "fairly good control symptoms wise" of his gout when he takes them. (*Id.*)

Carla Hulme, F.N.P., first treated Mr. Rendon in April 2009, at which time he indicated his gout had not flared up for "a few months." (*See* tr. 548–49, 553.) In June 2009, Mr. Rendon reported no gout flare ups but said he could not to work because when he does "he usually gets gouty flare ups." (Tr. 548.) Ms. Hulme explained that gout medication could control Mr. Rendon's gout even when working. (Tr. 549.) In September 2009, Mr. Rendon admitted he did not take his gout medication. (Tr. 546.) In November 2009, Mr. Rendon reported a painful, swollen left elbow after a weekend of heavy drinking. (Tr. 542.) The swelling improved by December of that year but had not gone away. (Tr. 540.) Ms. Hulme offered to perform an ultrasound, but Mr. Rendon refused. (Tr. 541.) In January 2010, Mr. Rendon reported continued fluid around his left elbow, but "it [was] not painful for the most part" and had improved since December. (Tr. 538.) Mr. Rendon also reported a minor gout flare up in his left knee a week prior that had gone away. (*Id.*) Ms. Hulme assessed Mr. Rendon as having a gouty tophus on his left elbow. (*Id.*)

**<u>Mental Health</u>**

Utah state prison clinical services and Weber human services ("Weber") treated Mr. Rendon from approximately April 2006 to December 2007. (Tr. 415–36, 556–636.) In April 2006, Richard Tucker, LCSW at Weber, noted Mr. Rendon had violence and rage issues and

admitted "he is more violent when smoking marijuana." (Tr. 422.) In May 2006, Mr. Tucker

noted that Mr. Rendon's low functioning would limit the amount of progress he could reasonably

make in group therapy but that he had shown improvement. (Tr. 424.) Mr. Tucker discharged

Mr. Rendon on February 26, 2007, with an Axis I diagnosis of Bipolar I Disorder. (Tr. 423.)

Mr. Rendon entered treatment with Weber again on April 20, 2007. (Tr. 415–16.) That month,

Bryan Bingham, LMFT at Weber, found Mr. Rendon's mood stable and normal but noted he

"appears to have Schizoaffective Disorder." (Tr. 416.) Later that month, Mr. Rendon reported

he had no mental health symptoms and did not want any medication; he did, however, request

substance abuse treatment "to learn how to stay out of trouble." (Tr. 418.)

In June 2007, Mr. Rendon reported a bipolar disorder diagnosis to prison clinical services

but stated he had never taken medication nor had psychiatric treatment. (Tr. 626–27.) Mr.

Rendon had no suicidal ideation and did not hear voices. (*Id.*) The next day, Mr. Rendon stated

he had taken mental health medications "to help remedy the effects of meth[amphetamine]" and

that he sometimes heard voices swearing at him. (Tr. 623–24.)

On July 5, 2007, Mr. Rendon's cellmate reported that Mr. Rendon attempted to hang

himself, but Mr. Rendon stated he never ripped the sheet or put it around his neck. (Tr. 620.)

Mr. Rendon refused to promise not to hurt himself and said he still felt suicidal because his

imprisonment had disappointed his family. (Tr. 620–21.) That night, Mr. Rendon denied being

suicidal and stated "I'm better now." (Tr. 618–19.) The next day, the psychiatrist classified Mr.

Rendon as a "moderate" acute suicide risk. (Tr. 616.) On July 9, Mr. Rendon returned to

general population. (Tr. 595.) In August 2007, Mr. Rendon requested therapy, because he

struggled with his incarceration. (Tr. 584.) He did not follow up after this initial session. (Tr.

583.) In November 2007, Mr. Rendon sought counseling for his self-purported inability to

control his thoughts and actions, and disjointed experiences such as not being able to urinate standing up and having inappropriate sexual thoughts. (Tr. 569.) Mr. Rendon refused mental health medication. (Tr. 569.)

In September 2008, LeeAnn Gossett, L.C.S.W., from the Department of Workforce Services, determined Mr. Rendon could not work at all for three months; she recommended vocational rehabilitation and anger management. (Tr. 461.) In November 2008, Pam Harrison, L.C.S.W., noted Mr. Rendon "quits [jobs] over frustration, boredom, not getting along." (Tr. 470, 476.)

In June 2009, Frederick King, L.C.S.W., recommended a psychiatric evaluation to decide whether Mr. Rendon had major depressive disorder, chronic; generalized anxiety disorder; polysubstance dependence; and possibly obsessive-compulsive personality disorder. (Tr. 519.) Mr. King noted Mr. Rendon's mental health issues "may have been chemically induced by his substance abuse issues." (Tr. 519.) Mr. King noted Mr. Rendon used marijuana and alcohol as a coping mechanism. (Tr. 514.)

In April 2010, Mark Corgiat, Ph.D., evaluated Mr. Rendon at the request of Mr. Rendon's attorney. (Tr. 522–29.) Mr. Rendon acknowledged having some psychological problems but stated he disagreed with those who think he has severe mental health issues. (Tr. 522.) Mr. Rendon noted he "smoke[s] pot too much" when he becomes manic. (*Id.*) Dr. Corgiat did not find evidence to support a diagnosis of Antisocial Personality Disorder but did determine that Mr. Rendon had a primary diagnosis of personality disorder with schizoid and paranoid personality characteristics. (Tr. 528–29.) Dr. Corgiat also found that Mr. Rendon "has not responded to medication management treatment for the previously diagnosed mood disorders

because his primary difficulty is reflective of the functional deficits associated with the Axis II diagnosis." (Tr. 529.)

### Job History

Mr. Rendon has sought temporary employment positions in warehouses, production, and forklift operation. (Tr. 66.) Mr. Rendon has a commercial driving license ("CDL") but cannot carry certain materials due to his criminal history. (Tr. 66–67, 69.) Because he lacks experience, Mr. Rendon has difficulty finding CDL work. (Tr. 67.)

Mr. Rendon has not worked longer than five months at a time. (Tr. 71.) Mr. Rendon testified he lost his longest-held job because he asked for time off for his wedding. (*Id.*) At the time of the May 26, 2010, hearing, Mr. Rendon had last worked through Staffing Resource Management at Kenco in the North Ogden Industrial Park in a warehouse. (Tr. 74.) That job ended because the employer no longer needed Mr. Rendon's help. (Tr. 75.) Prior to that position, Mr. Rendon worked in 2009 for three days digging foundations for home footings. (*Id.*) Mr. Rendon quit that position because it involved strenuous activity. (*Id.*) Mr. Rendon worked at Clearfield for approximately four months in 2008 but lost his employment there because a new policy excluded from employment anyone with a felony less than ten years old. (Tr. 76–78.) Mr. Rendon has held other short-term jobs, including working as a salt bagger and in assembly at a large company. (Tr. 329–336.) At the May 26 hearing, Mr. Rendon stated he has trouble maintaining employment because he lacked a strong work ethic when he was younger. (Tr. 73.)

### Substance Abuse

In addition to the references to substance abuse noted above, Mr. Rendon's testimony at the May and September 2010 hearings included multiple references to his substance abuse. At

the May 26, 2010, hearing, Mr. Rendon stated he has not used methamphetamines since 2003 but that marijuana had "been a little bit of a problem probably within the last few months." (Tr. 62.) Mr. Rendon also testified that many of his legal problems resulted from his marijuana use and that his felony convictions made finding employment difficult. (Tr. 63–65.)

## STANDARD OF REVIEW

42 U.S.C. section 405(g) provides for judicial review of a final decision of the Commissioner of the Social Security Administration ("SSA"). The Court reviews the Commissioner's decision to determine whether the record as a whole contains substantial evidence in support of the Commissioner's factual findings and whether the SSA applied the correct legal standards. 42 U.S.C. §405(g); *Lax v. Astrue*, 489 F.3d 1080, 1084 (10th Cir. 2007). The Commissioner's findings shall stand if supported by substantial evidence. 42 U.S.C. § 405(g).

Adequate, relevant evidence that a reasonable mind might accept to support a conclusion constitutes substantial evidence, and "[e]vidence is insubstantial if it is overwhelmingly contradicted by other evidence." *O'Dell v. Shalala*, 44 F.3d 855, 858 (10th Cir. 1994). The standard "requires more than a scintilla, but less than a preponderance." *Lax*, 489 F.3d at 1084. "Evidence is not substantial if it is overwhelmed by other evidence—particularly certain types of evidence (e.g., that offered by treating physicians)—or if it really constitutes not evidence but mere conclusion." *Gossett v. Bowen*, 862 F.2d 802, 805 (10th Cir. 1988) (internal quotation marks and citations omitted). Moreover, "[a] finding of 'no substantial evidence' will be found only where there is a conspicuous absence of credible choices or no contrary medical evidence." *Trimiar v. Sullivan*, 966 F.2d 1326, 1329 (10th Cir. 1992) (internal quotation marks and citations omitted).

Although the reviewing court considers "whether the ALJ followed the specific rules of law that must be followed in weighing particular types of evidence in disability cases," the court "will not reweigh the evidence or substitute [its] judgment for the Commissioner's," *Lax*, 489 F.3d at 1084 (internal quotation marks and citations omitted), but "review only the *sufficiency* of the evidence," *Oldham v. Astrue*, 509 F.3d 1254, 1257 (10th Cir. 2007) (emphasis in original). The court does not have to accept the Commissioner's findings mechanically, but "examine the record as a whole, including whatever in the record fairly detracts from the weight of the [Commissioner's] decision and, on that basis, determine if the substantiality of the evidence test has been met." *Glenn v. Shalala*, 21 F.3d 983, 984 (10th Cir. 1994) (internal quotation marks and citation omitted). "'The possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's findings from being supported by substantial evidence,'" and the court may not "'displace the agenc[y's] choice between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it de novo.'" *Lax*, 489 F.3d at 1084 (quoting *Zoltanski v. FAA*, 372 F.3d 1195, 1200 (10th Cir. 2004)).

In addition to a lack of substantial evidence, the Court may reverse where the Commission uses the wrong legal standards or the Commissioner fails to demonstrate reliance on the correct legal standards. *See Glass v. Shalala*, 43 F.3d 1392, 1395 (10th Cir. 1994); *Thomson v. Sullivan*, 987 F.2d 1482, 1487 (10th Cir. 1993); *Andrade v. Sec'y of Health & Human Servs.*, 985 F.2d 1045, 1047 (10th Cir. 1993).

## ANALYSIS

The Social Security Act ("Act") defines "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental

impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Moreover, the Act considers an individual disabled "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." *Id.* § 423(d)(2)(A).

In determining whether a claimant qualifies as disabled within the meaning of the Act, the SSA employs a five-part sequential evaluation. *See* 20 C.F.R. § 404.1520; *Williams v. Bowen*, 844 F.2d 748, 750–53 (10th Cir. 1988); *Bowen v. Yuckert*, 482 U.S. 137, 140–42 (1987). The analysis evaluates whether:

(1) The claimant presently engages in substantial gainful activity;
(2) The claimant has a medically severe physical or mental impairment or impairments;
(3) The impairment is equivalent to one of the impairments listed in the appendix of the relevant disability regulation which preclude substantial gainful activity;
(4) The impairment prevents the claimant from performing his or her past work; and
(5) The claimant possesses a residual functional capacity to perform other work in the national economy considering his or her age, education, and work experience.

*See* 20 C.F.R. § 404.1520. The claimant has the initial burden of establishing the disability in the first four steps. *Ray v. Bowen*, 865 F.2d 222, 224 (10th Cir. 1989). At step five, the burden shifts to the Commissioner to show the claimant retains the ability to perform other work existing in the national economy. *Id.*

The ALJ evaluated Mr. Rendon's claim through step five, making the following findings of fact and conclusions of law with respect to Mr. Rendon:

1. "[Mr. Rendon] met the insured status requirements of the Social Security Act through September 30, 2008." (Tr. 17.)
2. "[Mr. Rendon] has not engaged in substantial gainful activity since the amended onset date of August 7, 2008. (20 CFR 404.1520(b), 404.1571 *et seq.*, 416.920(b) and 416.971 *et seq.*)." (*Id.*)

3.  "[Mr. Rendon] has the following severe impairments: hyperuricemia, mood disorder, pain disorder with both psychological factors and medical condition; personality disorder and substance abuse. (20 CFR 404.1520(c) and 416.920(c))." (*Id.*)

4.  "[Mr. Rendon] does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d) and 416.920(d))." (Tr. 18.)

5.  "[B]ased on all of the impairments, including the substance use disorders, [Mr. Rendon] has the residual functional capacity to perform less than the full range of medium work as defined in 20 CFR 404.1567(c) and 416.967(c) with the following additional limitations:

    - [Mr. Rendon] has mild mental limitations, meaning 10% or less overall restriction, which means she [*sic*] can mentally perform most basic work activity, e.g., [Mr. Rendon] has the ability and aptitude necessary to do most jobs (20 CFR 404.1521(b) – 416.9721(b); in the ability to understand and remember detailed instructions; the ability to carry out very short and simple instructions; the ability to sustain an ordinary routine without special supervision; and the ability to set realistic goals or make plans independently of others.

    - [Mr. Rendon] has moderate limitations, meaning one-third or less overall restriction, in the ability to carry out detailed instructions; the ability to maintain attention and concentration for extended periods; the ability to work in coordination with or proximity to others without being distracted by them; the ability to interact appropriately with the general public; the ability to accept instructions and respond appropriately to criticism from supervisors; the ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes; and, the ability to respond appropriately to changes in the work setting.

    - [Mr. Rendon] has marked limitations, meaning two-thirds or less overall restriction, in the ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; and, the ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods." (Tr. 20–21.)

6.  "[Mr. Rendon] is unable to perform past relevant work (20 CFR 404.1565 and 416.965." (Tr. 27.)

7.  "[Mr. Rendon] was born on May 21, 1978 and was a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563 and 416.963)." (Tr. 28.)

8.  "[Mr. Rendon] has a limited education and is able to communicate in English (20 CFR 404.1564 and 416.964)." (*Id.*)

9. "[Mr. Rendon's] acquired job skills do not transfer to other occupations within the residual functional capacity defined above (20 CFR 404.1568 and 416.968)." (*Id.*)

10. "Considering [Mr. Rendon's] age, education, work experience, and residual functional capacity based on all of the impairments, including the substance use disorders, there are no jobs that exist in significant numbers in the national economy that [Mr. Rendon] can perform (20 CFR 404.1560(c), 404.1566, 416.960(c), and 416.966)." (*Id.*)

11. "If [Mr. Rendon] stopped the substance use, the remaining limitations would cause more than a minimal impact on [his] ability to perform basic work activities; therefore, [Mr. Rendon] would continue to have a severe impairment or combination of impairments." (Tr. 29.)

12. "If [Mr. Rendon] stopped the substance use, [he] would not have an impairment or combination of impairments that meets or medically equals any of the impairments listed in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d) and 416.920(d))." (*Id.*)

13. "If [Mr. Rendon] stopped the substance use, [he] would have the residual functional capacity to perform medium work as defined in 20 CFR 404.1567(c) and 416.967(c) with the following additional limitations:

    • [Mr. Rendon] has mild mental limitations, meaning 10% or less overall restrictions, which means she [*sic*] can mentally perform most basic work activity, e.g., the claimant has the ability and aptitude necessary to do most jobs (20 CFR 404.1521(b) – 416.9721(b); in the ability to understand and remember detailed instructions; the ability to carry out detailed instructions; the ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; the ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; the ability to interact appropriately with the general public; the ability to accept instructions and respond appropriately to criticism from supervisors; the ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes; the ability to respond appropriately to changes in the work setting; and, the ability to set realistic goals or make plans independently of others.

    • [Mr. Rendon] has moderate limitations, meaning one-third or less overall restriction, in the ability to maintain attention and concentration for extended periods; and, the ability to work in coordination with or proximity to others without being distracted by them." (Tr. 30–31.)

14. "If [Mr. Rendon] stopped the substance use, [he] would be able to perform past relevant work as a sandwich maker, D.O.T. # 317.664-010, which is classified as medium unskilled work with a SVP of 2; a forklift operator, D.O.T. # 921.8350-050, which is classified as medium semi-skilled work

with a SVP of 3, a salt bagger, D.O.T. # 920.587.018, which is classified as medium unskilled work with a SVP of 2, and as a production assembler, D.O.T. 706.687-010, which is classified as light unskilled work with a SVP of 2. This work does not require the performance of work related activities precluded by the residual functional capacity [Mr. Rendon] would have if he stopped the substance use (20 CFR 404.1565 and 416.965)." (Tr. 33.)

15. "Because [Mr. Rendon] would not be disabled if he stopped the substance use (20 CFR 404.1520(f) and 416.920(f)), [his] substance use disorders is [*sic*] a contributing factor material to the determination of disability (20 CFR 404.1535 and 416.935). Thus, [Mr. Rendon] has not been disabled within the meaning of the Social Security Act at any time from the alleged onset date through the date of this decision." (Tr. 34.)

In short, the ALJ concluded Mr. Rendon did not possess an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1, and that if he stopped the substance use he would have the residual functional capacity to perform past relevant work as a sandwich maker, forklift operator, salt bagger, and production assembler from the alleged onset date through the date of the Decision. (Tr. 11–40.)

In support of his claim this Court should reverse the Commissioner's decision, Mr. Rendon argues the ALJ erred: (1) by not finding Mr. Rendon's gout and intermittent explosive disorder to constitute severe impairments and by not considering said impairments at step three and in the residual functional capacity analysis ("RFC analysis"); (2) by not analyzing or finding that Mr. Rendon's gout and intermittent explosive disorder meet or equal a listing at step three; (3) by finding Mr. Rendon has the residual functional capacity to perform medium work with nonexertional limitations; and (4) by not adequately considering Mr. Rendon's failed work attempts. (Pl.'s Opening Br. 14–15, 18, 20, 23, ECF No. 10.)

## I. Rejection of Severe Impairments

Mr. Rendon argues the ALJ erred by not finding Mr. Rendon's gout and intermittent explosive disorder to constitute severe impairments. (Pl.'s Opening Br. 14–18, ECF No. 10.) As a result, Mr. Rendon argues the ALJ also erred by not considering gout and intermittent explosive disorder adequately, in combination with Mr. Rendon's other impairments and in the RFC analysis. (*Id.*) The Court disagrees.

Step two of the sequential evaluation process requires the ALJ to decide whether the claimant has a severe impairment. 20 C.F.R. § 404.1520(a)(4)(ii). An impairment or combination of impairments qualifies as severe when it significantly limits a person's physical or mental ability to perform basic work activities. 20 C.F.R. § 404.1521(a). If the ALJ does not find at step three that the claimant's impairment or impairments meets or equals a listing in appendix 1, the ALJ continues to determine the claimant's residual functional capacity. 20 C.F.R. § 404.1520(a)(4)(iii)–(iv), (e). In determining residual functional capacity, the ALJ considers all medically determinable impairments, including non-severe impairments. 20 C.F.R. § 404.1545(a)(2). Because the ALJ considers both severe and non-severe impairments at later steps, any failure to designate additional severe impairments at step two qualifies as harmless if the ALJ finds at least one severe impairment and continues with the sequential evaluation process. *Carpenter v. Astrue*, 537 F.3d 1264, 1266 (10th Cir. 2008); *Brescia v. Astrue*, 287 F. App'x 626, 629 (10th Cir. 2008).

Here, the ALJ found at step two of the sequential evaluation process that Mr. Rendon had severe impairments consisting of "hyperuricemia, mood disorder, pain disorder with both psychological factors and medical condition; personality disorder and substance abuse." (Tr. 17.) Having found Mr. Rendon possessed these severe impairments, the ALJ continued with the

sequential evaluation process.  (Tr. 17–35.)  Because the ALJ found severe impairments at step two and continued with the sequential evaluation process, any error at step two qualifies as harmless.

With respect to the RFC determination, the ALJ adequately considered Mr. Rendon's gout and intermittent explosive disorder in reaching its RFC conclusion.  For example, the ALJ noted the pain from gout, (tr. 21), and Mr. Rendon's failure to take his gout medication because of his substance abuse, (tr. 23–24).  The ALJ considered the diagnosis of intermittent explosive disorder in her RFC analysis as well.  (Tr. 22, 27.)  Accordingly, this Court finds no error on these bases.

## II. The Step Three Analysis

Mr. Rendon argues the ALJ erred at step three of the sequential evaluation process by not considering whether Mr. Rendon's gout meets or equals a listing and by not properly evaluating his intermittent explosive disorder.  (Pl.'s Opening Br. 18–20.)  At step three, the ALJ considers whether any of the claimant's impairments meets or equals an impairment listed in the "Listing of Impairments," 20 C.F.R. Part 404, subpt. P, app. 1.  *Lax*, 489 F.3d at 1085; 20 C.F.R. § 416.920(a)(4)(iii).  If any of the claimant's impairments meets or equals a listing, the ALJ must find the claimant disabled and thus entitled to benefits.  *Lax*, 489 F.3d at 1085; *see also* 20 C.F.R. § 416.920(d).  However, "[t]o show that an impairment or combination of impairments meets the requirements of a listing, a claimant must provide specific medical findings that support each of the various requisite criteria for the impairment."  *Lax*, 489 F.3d at 1085 (citing 20 C.F.R. §§ 404.1525, 416.925).

Mr. Rendon argues that had the ALJ found his gout constitutes a severe impairment at step two, the ALJ would have found that Mr. Rendon's gout meets listing 14.09, inflammatory

arthritis.  (Pl.'s Opening Br. 18–19.)  However, the plaintiff bears the burden at step three of

showing he suffers a severe impairment that meets or equals a listing.  *See Ray*, 865 F.2d at 224

(noting "the claimant bears the burden of proving a disability").  The Listing of Impairments sets

forth the criteria for finding a claimant suffers a severe impairment that meets or equals listing

14.09.  Mr. Rendon does not provide an analysis of the requirements of listing 14.09 showing

record evidence to support the necessary criteria.

More importantly, substantial evidence supports the ALJ's finding that Mr. Rendon's

gout cannot meet the durational requirement for a finding of disability.  *See* 20 C.F.R. §

404.1509 ("Unless your impairment is expected to result in death, it must have lasted or must be

expected to last for a continuous period of at least 12 months. We call this the duration

requirement."); 20 C.F.R. § 404.1526(a) (noting medical equivalence equal severity and duration

to an impairment listed in appendix 1).  The ALJ noted Mr. Rendon's gout "was well-defined for

only a couple of weeks," (tr. 17.), and substantial evidence in the record supports that finding.

Accordingly, Mr. Rendon's gout cannot meet the durational requirement.

Mr. Rendon next argues the ALJ erred by not analyzing whether Mr. Rendon's

intermittent explosive disorder meets or equals a listing impairment.  (Pl.'s Opening Br. 19–20.)

Had the ALJ performed the analysis, Mr. Rendon argues, the ALJ would have found that Mr.

Rendon meets or equals listing 12.08, which covers personality disorders.  (*Id.*)  The Court

disagrees.

In support of his argument, Mr. Rendon points to Dr. Swaner's diagnosis of intermittent

explosive disorder.  (*Id.* at 19.)  But diagnosis alone does not suffice to show an impairment

meets or equals a listing.  *See Bernal v. Bowen*, 851 F.2d 297, 300 (10th Cir. 1988) (noting

requirement "that the 'medical findings' are at least equal in severity and duration as those in the

listed findings"). Moreover, Dr. Swaner's diagnosis came while Mr. Rendon was abusing drugs. (*See* Tr. 513–16, 649.) Mr. Rendon's drug use affects his intermittent explosive disorder, which has a material impact on his claim. *See* SSR 13-2p, 78 Fed. Reg. 11939 (Mar. 22, 2013) (discussing evaluation of cases involving drug addiction and alcoholism). Dr. Houston—after reviewing all of Mr. Rendon's records with consideration of the periods of sobriety—opined that Mr. Rendon did not meet a listing. (Tr. 32, 102–03.) The Court will address Mr. Rendon's challenge to the weight given to Dr. Houston's opinion below.

Moreover, the 12.08 Personality Disorder listing requires a claimant to satisfy criteria in both subsection A and subsection B. 20 C.F.R. Part 404, subpt. P, app. 1, § 12.08. Here, Mr. Rendon cannot show he meets the subsection B criteria, to wit, that a listing in subsection A results in at least two of the following: (1) *marked* restrictions of activities of daily living; or (2) *marked* difficulties in maintaining social functioning; or (3) *marked* difficulties in maintaining concentration, persistence, or pace; or (4) *repeated* episodes of decompensation, each of extended duration. *Id.* Mr. Rendon does not challenge the ALJ's findings that, absent drug use, Mr. Rendon would have *no* restrictions in activities of daily living, *moderate* difficulties in social functioning, *moderate* difficulties in concentration, persistence, and pace, and *no* decompensation episodes. (Tr. 30.) These findings—which Mr. Rendon does not challenge— directly preclude a finding that Mr. Rendon meets the 12.08 Personality Disorder listing.

### III. Residual Functional Capacity

Mr. Rendon next challenges the ALJ's determination of Mr. Rendon's residual functional capacity. Specifically, Mr. Rendon faults the ALJ's decision to grant great weight to Dr. Houston's medical expert opinion and grant only little to moderate weight to Mr. Rendon's treating and examining sources. (Pl.'s Opening Br. 20–22.) Rather than challenging the bases

upon which the ALJ rested her credibility determinations, Mr. Rendon's argument consists of a number of bald statements about the presumptions of weight generally accorded to the various opinions at issue and stating that these opinions were consistent with each other, and therefore deserved greater weight than Dr. Houston's opinion because Dr. Houston never treated Mr. Rendon. (*Id.*)

Initially, the Court notes "the ALJ, not a physician, is charged with determining a claimant's RFC from the medical record." *Howard v. Barnhart*, 379 F.3d 945, 949 (10th Cir. 2004). Because Mr. Rendon challenges the weight the ALJ accorded the various opinions in determining Mr. Rendon's residual functional capacity, the analysis turns on the ALJ's credibility determinations. *See Poppa v. Astrue*, 569 F.3d 1167, 1171 (10th Cir. 2009) ("Since the purpose of the credibility evaluation is to help the ALJ assess a claimant's RFC, the ALJ's credibility and RFC determinations are inherently intertwined.")

An ALJ must evaluate every medical opinion. 20 C.F.R. § 404.1527(c). If the ALJ finds a treating physician's opinion "well-supported by medically acceptable clinical and laboratory diagnostic techniques and [] not inconsistent with the other substantial evidence in [the] case record," the ALJ must give the opinion controlling weight. 20 C.F.R. § 404.1527(c)(2). When the ALJ does not give a treating physician's opinion controlling weight, the ALJ must consider certain factors. 20 C.F.R. section 404.1527(c) provides these factors:

> (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship, including the treatment provided and the kind of examination or testing performed; (3) the degree to which the physician's opinion is supported by relevant evidence; (4) consistency between the opinion and the record as a whole; (5) whether or not the physician is a specialist in the area upon which an opinion is rendered; and (6) other factors brought to the ALJ's attention which tend to support or contradict the opinion.

*See Watkins v. Barnhart*, 350 F.3d 1297, 1300–01 (10th Cir. 2003) (citation omitted).  To reject a medical opinion, the ALJ must provide "'specific, legitimate reasons.'"  *Drapeau v. Massanari*, 255 F.3d 1211, 1213 (10th Cir. 2001) (quoting *Miller v. Chater*, 99 F.3d 972, 976 (10th Cir. 1996)).

Yet the ALJ's decision need not *discuss explicitly* all of the factors for each of the medical opinions.  *See Oldham v. Astrue*, 509 F.3d 1254, 1258 (10th Cir. 2007) (stating that a lack of discussion of each factor does not prevent the court from according the decision meaningful review).  When considering medical opinion evidence, the ALJ must weigh and resolve evidentiary conflicts and inconsistencies.  *See, e.g.*, *Eggleston v. Bowen*, 851 F.2d 1244, 1247 (10th Cir. 1988) (reflecting ALJ's resolution of evidentiary conflicts between medical providers).

Here, the ALJ provided substantial discussion of the reasons behind the weight accorded Mr. Rendon's treating and examining sources.  (Tr. 24–27.)  Mr. Rendon specifically complains the ALJ should have accorded greater weight to the opinions of Dr. Mark Corgiat; Michelle Hicks, F.N.P.; Pam Harrison, L.C.S.W.; Rhonda Lee, P.A.C.; and Carla Hulme, F.N.P.  (Pl.'s Opening Br. 21.)  The Court briefly addresses each in turn before examining the ALJ's decision to accord "great weight" to Dr. Houston's opinion.

The ALJ accorded Dr. Corgiat's opinion "little weight" for the following reasons.  First, the ALJ noted Dr. Corgiat is not a treating physician.  (Tr. 25.)  The ALJ then noted Dr. Corgiat did not consider Mr. Rendon's general lack of compliance with his prescribed medications.  (*Id.*)  This failing has significance because Mr. Rendon admitted that his medication regimen—when complied with—generally controls his gout.  (*Id.*)  The ALJ also noted Dr. Corgiat failed to consider Mr. Rendon's continued marijuana use and its effect on Mr. Rendon's behavior.  (*Id.*)

The ALJ found this failure of particular importance in light of Mr. Rendon's statement that he has more violence and rage issues when he uses marijuana.  (*Id.*)  Finally, the ALJ noted the inconsistency of Dr. Corgiat's opinion with that of Dr. Houston, who had reviewed the entire record, including the most recent medical records.  (*Id.*)  Because the ALJ provided specific, legitimate reasons for according Dr. Corgiat's opinion "little weight," the Court finds no error.

The ALJ also accorded "little weight" to Mr. Rendon's treating sources:  Michelle Hicks, F.N.P., Pam Harrison, L.C.S.W., Rhonda Lee, P.A.C., LeeAnn Gossett, L.C.S.W., and Carla Hulme, F.N.P.  (Tr. 26–27.)  In according "little weight" to each of these opinions, the ALJ noted that family nurse practitioners, licensed clinical social workers, and physicians assistants-certified do not constitute "acceptable sources" under 20 C.F.R. section 416.913(a).  (Tr. 26.)  Rather, the ALJ concluded they constitute "other sources," which "are to be considered, but . . . are entitled to less weight than that accorded to the opinions of 'acceptable medical sources.'"  (*Id.*)  The ALJ also noted that, as licensed clinical social workers, Ms. Harrison and Ms. Gossett are "not qualified to opine on [Mr. Rendon]'s physical impairments."  (*Id.*)  Regarding Ms. Rhonda Lee, P.A.C., the ALJ noted she did not support her opinion with objective medical evidence.  (*Id.*)  The ALJ similarly found that Ms. Hulme's opinion lacked record support.  (Tr. 26–27.)  Finally, the ALJ accorded Ms. Gossett's opinion little weight because her "opinion is for duration of less than one year."  (*Id.*)  The Court will not reweigh the evidence presented to the agency or "substitute [its] judgment for the Commissioner's."  *Lax*, 489 F.3d at 1084.  Review of the record shows substantial evidence supports the ALJ's credibility determinations.  Therefore, the Court finds no error in the ALJ's evaluation of the medical opinion evidence.

## IV. Consideration of Failed Work Attempts

Mr. Rendon next argues the ALJ erred by not considering Mr. Rendon's failed work attempts in determining his residual functional capacity and in the ALJ's finding that Mr. Rendon does not qualify as disabled.  (Pl.'s Opening Br. 23, ECF No. 10.)

An ALJ must base her residual functional capacity assessment on all of the relevant evidence in the case record, including attempts to work.  SSR 96-8p (July 2, 1996); *Kilinski ex rel. Kilinski v. Astrue*, 430 F. App'x 732, 738 (10th Cir. 2011) (unpublished) (citing SSR 96-8p "RFC assessment must be based on all relevant evidence, including '[e]vidence from attempts to work'").  A review of the record shows the ALJ properly considered Mr. Rendon's failed work attempts.  For example, in determining Mr. Rendon's residual functional capacity the ALJ noted Mr. Rendon held a temporary job for two months but was sent home a number of times because the company ran out of product.  (Tr. 31.)  Ultimately, Mr. Rendon had an argument that resulted in harassment charges, but the temporary employer notified Mr. Rendon that he remained eligible for work.  (Tr. 31–32.)  Moreover, the ALJ found Mr. Rendon's condition would improve, and he would not be disabled if he stopped the substance abuse.  (Tr. 32–34.)  That the failed work attempts occurred during periods of substance abuse severely undercuts Mr. Rendon's argument that his failed work attempts evidence a disability.  Accordingly, the Court finds no error on this basis.

## <u>CONCLUSION</u>

Based on the foregoing, the Court finds that substantial evidence supports the

Commissioner's decision and AFFIRMS the Commissioner's decision in this case.

DATED this 10th day of December, 2013.

BY THE COURT:

Evelyn J. Furse
United States Magistrate Judge